James C. Shah (SBN 260435)
Email: jcshah@millershah.com
Kolin C. Tang (SBN 279834)
Email: kctang@millershah.com
**MILLER SHAH LLP**
8730 Wilshire Boulevard, Suite 400
Beverly Hills, California 90211
Telephone: (866) 540-5505
Facsimile: (866) 300-7367

Christopher E. Roberts (SBN 363586)
Email: CRoberts@butschroberts.com
BUTSCH ROBERTS & ASSOCIATES LLC
7777 Bonhomme Avenue, Suite 1300
Clayton, Missouri 63105
Telephone: (314) 863-5700

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| LINDA DANIELS, individually and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>AIRO MARKETING, INC., d/b/a COST GUIDE and CONTRACTOR APPOINTMENTS,<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

## CLASS ACTION COMPLAINT

COMES NOW Plaintiff, Linda Daniels ("Plaintiff" or "Daniels"), individually, and on behalf of all others similarly situated, through her undersigned counsel, and for her Class Action Complaint against Defendant, Airo Marketing, Inc. d/b/a Cost Guide and Contractor Appointments ("Defendant"), states:

## INTRODUCTION AND BACKGROUND ON THE TCPA

1. The receipt of unwanted telemarketing communications has been, for many years, the top consumer complaint made to state and federal agencies around the country. This case is about stopping incessant telemarketers, like Defendant, from placing text messages to the cell phones of Daniels and likely thousands of other persons whose phone numbers were registered on the National Do-Not-Call Registry ("DNC List").

2. Daniels brings this class action lawsuit against Defendant for improperly sending these text messages to persons whose phone numbers were registered on the DNC List, in violation of the TCPA, U.S.C. § 227 *et seq.*, and the TCPA's corresponding regulations.

3. In 1991, after passage with bipartisan support in Congress, President George H.W. Bush signed the Telephone Consumer Protection Act ("TCPA") into law, to protect consumers' privacy rights; namely, the right to be left alone from unwanted telemarketing communications. A leading sponsor of the TCPA described unwanted telemarketing communications as "the scourge of modern civilization." 137 Cong. Rec. 30821 (1991).

4. The TCPA affords protections to people, like Daniels, who receive telephone solicitation communications, despite their phone numbers being registered on the DNC List. *See* 47 U.S.C. § 227(c)(3)(A)(iii); 47 C.F.R. § 64.1200(c)(2). The penalty for violating the TCPA is up to $500 per call, and up to $1,500 per call if the TCPA is willfully or knowingly violated. *See* 47 U.S.C. § 227(c)(5).

5. The problem with receiving unwanted telemarketing communications is a

problem that most people in this country, like Daniels, frequently face. For example, in the first three months of 2026 alone, approximately 11.9 billion robocalls were placed in the United States. RobocallIndex.com, YouMail Robocall Index, https://robocallindex.com/history/time (last visited April 8, 2026).

6. Decades after the TCPA passed into law, it is still unfortunately the case that "month after month, unwanted telemarketing calls and texts top the list of consumer complaints received by the [Federal Communications] Commission." *Omnibus TCPA Order*, 30 FCC Rcd. 7961, 7964 (F.C.C. July 10, 2015).

7. The private right of enforcement of the TCPA is critical to stopping the proliferation of these unwanted telemarketing communications. For example, while the Federal Communications Commission ("FCC") levied more than $200 million in penalties against telemarketers between 2015 and 2018, it collected less than $7,000 of that amount. *See* Sarah Krouse, *The FCC Has Fined Robocallers $208 Million. It's Collected $6,790*, THE WALL STREET JOURNAL, March 28, 2019, https://www.wsj.com/articles/the-fcc-has-fined-robocallers-208-million-its-collected-6-790-11553770803.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over the TCPA claims in this action under 28 U.S.C. § 1331, which grants this Court original jurisdiction of all civil actions arising under the laws of the United States.

9. This Court has personal jurisdiction over Defendant because Defendant markets its clients' products and services to persons located in California, uses California area codes to place telemarketing communications, transacts business in California, directly markets its services in California, and for the reasons otherwise set forth in this Complaint.

10. Defendant has continuous and systematic contacts with the State of California.

11. Daniels was (and is) a resident and citizen of Los Angeles, California at

all times relevant to this Complaint.

12. Venue is proper under 28 U.S.C. §§ 1391(b)(2) as a substantial portion of the events giving rise to the claims herein arose in this District and the harms of Defendant's actions were sustained in this venue.

13. The Court has jurisdiction over this dispute for these reasons and for the reasons set forth in this Complaint.

## PARTIES

14. At all times relevant to this Complaint, Daniels was, and is still, the owner of a cell phone, with a phone number of 213-XXX-8948.

15. Daniels's phone number was registered on the DNC List on March 3, 2025, for the purpose of being left alone by telemarketers.

16. The monthly bill associated with Daniels's phone number is issued in her name, and not in the name of a business.

17. Daniels uses her phone primarily for personal purposes, such as communicating with friends and family members.

18. Defendant Airo Marketing, Inc. is a Minnesota corporation with its principal place of business in Minnesota. Defendant has been authorized and in good standing to transact business in California and throughout the United States at all times material to this Complaint.

19. Defendant has registered with the Minnesota Secretary of State the "Assumed Name" of "Cost Guide" as a name under which it may transact business.

20. Defendant has also registered with the Minnesota Secretary of State the "Assumed Name" of "Contractor Appointments" as a name under which it may transact business.

21. One of Defendant's websites is www.costguide.com (referred to as "the Cost Guide website"). The privacy policy of the Cost Guide website states that the website is owned and operated by "Airo Marketing, Inc."

22. The Cost Guide website states that Defendant helps "homeowners like you

find the best deals on home improvement projects" and that Defendant wants to "help connect you with local pros, cost savings and access to the best financing for your project!"

23. Defendant also has a LinkedIn profile.

24. Defendant's LinkedIn profile states that Defendant's industry is "advertising services."

25. On information and belief, Defendant makes a profit from its marketing in that it gets paid for this marketing from various contractors for projects such as home improvement projects. One way in which Defendant is paid is by being paid for each appointment scheduled with a contractor.

26. Another website Defendant owns and operates is www.contractorappointments.com (referred to as the Contractor Appointments website).

27. The Contractor Appointments website identifies Defendant as the company responsible for the website.

28. The Contractor Appointments website states that Defendant "will automatically process payments of $65-$650 for each appointment sent to the contractor . . . ."

29. One of Defendant's founders and CEO, Sean Conners, also has a LinkedIn profile. Mr. Conners's LinkedIn profile states that Defendant provides "lead generation for Home Service brands."

30. Defendant markets the products and services of its clients/contractors (including home improvement projects) by, in part, placing telemarketing communications, such as the sending of text messages regarding said services.

31. Daniels and the putative class members did not provide "prior express written consent" (as that term is defined in 47 C.F.R. §64.1200(f)(9)) or any form of consent to be contacted on their phones by Defendant or anyone acting on its behalf.

//

## DEFENDANT'S TEXT MESSAGES TO PLAINTIFF

32. On March 8, 2025, Defendant, or someone acting on its behalf, sent a text message to Daniels, stating:

> Still needing to price out your bathroom remodel project?

33. On March 22, 2025, Defendant, or someone acting on its behalf, sent a text message to Daniels, stating:

> Your upcoming bathroom remodel project is our highest priority right now.
>
> Are you ready to move forward with an estimate (sic)?

34. On April 5, 2025, Defendant, or someone acting on its behalf, sent a text message to Daniels, stating:

> Our reps are committed to helping you get the best price for your bathroom remodel project.
>
> Text STOP to cancel.
> Need more estimates?
> -CostGuide

35. On April 19, 2025, Defendant, or someone acting on its behalf, sent a text message to Daniels, stating:

> We can usually work with any budget or timeline!
> Are you still looking for a bathroom remodel estimate to help compare costs?

36. On May 3, 2025, Defendant, or someone acting on its behalf, sent a text message to Daniels, stating:

> We want to make sure we're providing value . . .
>
> Can we help you price out your bathroom remodel estimate?

37. On May 17, 2025, Defendant, or someone acting on its behalf, sent a text message to Daniels, stating:

> Are you still looking for a bathroom remodel estimate to help compare

costs?

38. On May 31, 2025, Defendant, or someone acting on its behalf, sent a text message to Daniels, stating:

> Our teams offer fantastic financing options for homeowners in your area.
>
> Text STOP to cancel. Are you looking for help getting a bathroom remodel estimate?
> -CostGuide

39. Each of these text messages appeared in the same string of text messages.

40. Each of these text messages appeared as having originated from phone number 323-676-1194.

41. Daniels never inquired of Defendant's services, nor did she provide any form of consent to be contacted by Defendant on her cell phone.

42. Daniels seeks recovery individually, and on behalf of the putative class members, for the text messages sent to Daniels and the putative class members by or on behalf of Defendant despite their phone numbers being registered on the DNC List.

## DIRECT AND VICARIOUS LIABILITY

43. Without the benefit of discovery, and because Defendant disclosed its identity through the text messages at issue, Daniels assumes Defendant directly sent the text messages at issue.

44. However, if some or all the texts were placed by third-party/parties on behalf of Defendant, in the alternative, Defendant is vicariously liable for sending those text messages.

45. On May 9, 2013, the FCC determined that telemarketers like Defendant could not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would

> particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside of the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain relief. As the FTC noted, because "[s]ellers may have thousands of "independent" marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy.

*In re: Dish Network, LLC,* 28 F.C.C. Rcd. 6574 at 6588 (May 9, 2013) (internal citations omitted).

46. Moreover, the May 2013 FCC ruling rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal actual agency and immediate direction and control over third parties who place a telemarketing call. *Id.* at 6587 n. 107.

47. The evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593.

48. If Defendant directly placed the texts at issue to Daniels and the putative class members, Defendant is directly liable for the sending of those text messages.

49. However, Defendant may have hired, encouraged, permitted, and enjoyed the benefits of mass telemarketing by third-party telemarketers.

50. If Defendant did not directly place the texts at issue to Daniels and the putative class members, Defendant's third-party telemarketers had actual and/or apparent authority to act on behalf of Defendant.

51. Likewise, Defendant also ratified its agents' violations of the TCPA by

accepting sales from unlawful telemarketing communications.

52. Defendant controlled or had the right to control the marketing activities of those acting on its behalf.

53. Defendant was the principal to telemarketing agent(s) who were acting on their behalf.

54. Defendant is not permitted under the law to outsource and contract their way out of liability by directing and benefitting from their captive agents' TCPA violations.

55. For the count identified below, if Defendant directly sent the text messages at issue to Daniels and the putative class members, it is directly liable. Alternatively, to the extent any texts were sent by a third-party agent(s) acting on Defendant's behalf, Defendant is vicariously liable for those unlawful communications.

## CLASS ALLEGATIONS

56. Pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3), Plaintiff brings this lawsuit as a class action on behalf of herself, and all others similarly situated. This action satisfies the requirements of Rule 23.

57. Daniels seeks to represent the following class:

> **DNC Class:** All persons in the United States who from four years prior to the date of the filing of this lawsuit until the date of class certification: (1) received two or more text messages during a 12-month period in connection with the marketing of Defendant's products and/or services; (2) whose number was registered on the DNC List for more than 30 days at the time the text messages were received; and, (3) whose phone number is registered to an individual and not a business.

58. Daniels reserves the right to add administrative subclasses, additional classes, and/or to amend the definition.

59. The members of the proposed class are so numerous that joinder of all members is impracticable. Daniels reasonably believes that hundreds or thousands of people have been harmed by Defendant's actions. The phone numbers of the members

of the proposed class are readily identifiable through records available to Defendant or those acting on their behalf.

60. Most members of the proposed class have suffered damages in an amount such that it would make filing separate lawsuits by individual members economically infeasible.

61. On information and belief, Defendant has texted, and likely continues to text, people whose numbers are on the DNC List. It is reasonable to expect that Defendant will continue to place such text messages, absent this lawsuit.

62. Common questions of law and fact exist as to all members of the proposed Class and predominate over any questions affecting only individual members. The questions of law and fact common to the proposed Class include, but are not limited to:

a. Whether Defendant's conduct of placing text messages to phone numbers on the DNC List violates 47 U.S.C. § 227(c) and/or the TCPA's corresponding regulations;

b. Whether the text messages were "solicitations," as defined by the TCPA;

c. Whether Defendant maintained and effectively implemented sufficient protocols to prevent the sending of text messages to persons whose phone numbers are on the DNC List;

d. Whether Defendant's conduct violates the rules and regulations implementing the TCPA; and

e. Whether Daniels and the putative class members are entitled to increased damages for each violation based on the willfulness of Defendant's conduct.

63. Daniels's claims are typical of the claims of the proposed class members because her claims arise from the same practice that gives rise to the claims of the members of the proposed class and are based on the same legal theories.

64. Daniels and her counsel will fairly and adequately protect the interests of

the members of the proposed class. Daniels's interests do not conflict with the interests of the proposed class she seeks to represent, and she has retained lawyers who are competent and experienced in class action litigation, TCPA litigation and consumer law.

65. Daniels's counsel will vigorously litigate this case as a class action.

66. A class action is superior to all individual lawsuits for this controversy. Joinder of all proposed members of the proposed class in one action is impracticable, if not impossible, and prosecuting hundreds or thousands of individual actions is not feasible. The size of individual claims is likely not large enough to justify filing a separate action for each claim. For many, if not most members of the proposed class, a class action is the only procedural mechanism that will allow recovery. Even if members of the proposed class had the resources to pursue individual litigation, that method would be unduly burdensome to the courts. Individual litigation could also result in inconsistent adjudications.

67. In contrast, a class action is superior in that it will benefit the court and litigating parties through efficiency, economy of scale and unitary adjudication resulting from supervision of the litigation by a single court.

68. Questions of law and fact, particularly (and not limited to) the propriety of sending text message solicitations to persons on the DNC List, predominate over questions affecting only individual members.

69. Defendant has acted or refused to act on grounds that apply generally to the Class, making final injunctive relief or corresponding declaratory relief appropriate with respect to the putative class members.

## COUNT I
## Violations of the Telephone Consumer Protection Act
## 47 U.S.C. § 227(c), *et seq.* (National DNC List Violations)

70. Daniels incorporates by reference the allegations of the previous paragraphs as if fully stated in this Count.

71. The TCPA provides that "a person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection" may recover $500 for each violation, and up to $1,500 for each violation, if the violation is determined to be willful. *See* 47 U.S.C. § 227(c)(5).

72. In addition, the TCPA allows the Court to enjoin Defendant's violations of the TCPA's regulations prohibiting the sending of text messages to phone numbers registered on the DNC List. *See* 47 U.S.C. § 227(c)(5)(A).

73. By sending text messages to Daniels's and the DNC Class members' phone numbers, which were registered on the DNC List, Defendant violated the TCPA, including, but not limited to, 47 U.S.C. § 227(c), and the TCPA's corresponding regulations.

74. Defendant knew or had reason to know that Daniels's and the putative class members' phone numbers were on the DNC List but texted them anyway.

75. Defendant willfully violated the TCPA by sending text messages to Daniels and the DNC Class members despite knowing or having reason to know they did not have consent to call them and knowing their numbers were registered on the DNC List.

76. Daniels and the putative class members are entitled to damages of $500.00 per violation for each call placed by Defendant in violation of the TCPA and up to $1,500.00 per violation if the Court finds that Defendant willfully violated the TCPA.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff Linda Daniels, individually, and on behalf of all others similarly situated, requests that the Court:

a. Enter an order pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3), certifying the proposed Class, appointing Plaintiff as the DNC List Class representative, and appointing her counsel as class counsel;

b. Enter judgment in favor of Plaintiff and the DNC List Class members and

against Defendant for all damages and other relief available under the TCPA, 47 U.S.C. § 227(c), including injunctive relief, statutory damages of up to $500 per violation, and up to $1,500 per violation if Defendant willfully violated the TCPA;

c. Enter a judgment in favor of Plaintiff and the DNC List Class that enjoins Defendant from violating the TCPA's provisions and regulations;

d. Enter judgment in favor of Plaintiff and the DNC List Class for all applicable pre-judgment and post-judgment interest amounts;

e. Enter judgment in favor of Plaintiff and the DNC List Class for all costs, including the cost of class notice; and

f. Award Plaintiff and the DNC List Class members such further and other relief the Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Please take notice that Plaintiff Linda Daniels demands a jury trial.

Dated: April 15, 2026

Respectfully submitted,

MILLER SHAH LLP

*/s/James C. Shah*
James C. Shah (SBN 260435)
Email: jcshah@millershah.com
Kolin C. Tang (SBN 279834)
Email: kctang@millershah.com
8730 Wilshire Boulevard, Suite 400
Beverly Hills, California 90211
Telephone: (866) 540-5505
Facsimile: (866) 300-7367

BUTSCH ROBERTS & ASSOCIATES LLC

*/s/Christopher E. Roberts*
Christopher E. Roberts (SBN 363586)
Email: CRoberts@butschroberts.com
7777 Bonhomme Avenue, Suite 1300
Clayton, Missouri 63105
Telephone: (314) 863-5700

*Attorneys for Plaintiff*